# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

LESTER HARLAND WILSON,
Defendant and Appellant.

S189373

Riverside County Superior Court
RIF079858

June 8, 2023

Justice Corrigan authored the opinion of the Court, in which Chief Justice Guerrero and Justices Liu, Kruger, Groban, Jenkins, and Evans concurred.

PEOPLE v. WILSON

S189373


Opinion of the Court by Corrigan, J.


Defendant Lester Harland Wilson tortured and killed Uwe Durbin. In the process, he kidnapped Uwe[1] and his family members and raped the girlfriend of Uwe's brother. A jury convicted him in 2000 of first degree murder, two counts of forcible rape, and enhancements for personal use of a firearm.[2] Finding true special circumstances for committing murder during a kidnapping and intentional infliction of torture,[3] it set the penalty at death. On appeal, the guilt judgment was affirmed. The sentence was reversed, however, because a juror was improperly discharged during penalty deliberations. (*People v. Wilson* (2008) 44 Cal.4th 758 (*Wilson*).)

Following a retrial in 2010, defendant was again sentenced to death. We affirm this judgment.

---

[1]   Because Uwe and his brother Mike share a surname, we refer to them by their given names to avoid confusion.

[2]   Penal Code sections 187, subdivision (a), 261, subdivision (a)(2), 12022.5.

[3]   Penal Code sections 190.2, subdivision (a)(17)(B) and (a)(18). All further statutory references are to the Penal Code unless otherwise indicated.

## I. BACKGROUND

### A. *Prosecution's Aggravating Evidence*

#### 1. *Underlying Offenses and Special Circumstances*

Uwe Durbin was struggling financially in 1997 and lived at the homes of various friends. He stayed for a time with defendant and his wife, Barbara Phillips.[4]

Defendant suspected Uwe had stolen his television. On the morning of June 8, 1997, defendant and Phillips went looking for Uwe at his brother's apartment. When Mike Durbin opened the door, defendant put a gun to his head and pushed his way inside. Phillips followed. Mike's girlfriend, Lisa R., was there, along with their infant son and Lisa's two older children. Defendant demanded to know where "his stuff" was and where he could find Uwe. Mike did not know what he was talking about and did not reply.

Still pointing the gun at Mike's head, defendant ordered the entire family to leave with him. Defendant and Mike got into Mike's car; Lisa and the children joined Phillips in her car. As Mike pulled out of the carport, Uwe walked up. Defendant jumped out and confronted Uwe about the television. After Uwe denied all knowledge of it, defendant forced him into the backseat of Mike's car. The two cars were driven to defendant's house.

Everyone assembled in the living room, where defendant and Phillips demanded that their property be returned. When

---

[4] Defendant and Phillips were tried together but with separate juries. She was convicted of first degree murder with kidnapping and torture special circumstances and a gun use enhancement, and was sentenced to life imprisonment without possibility of parole. (*Wilson, supra,* 44 Cal.4th at p. 770, fn. 1.)

Uwe maintained he had taken nothing, defendant shot him in the knee. Mike rose from the couch but stopped when defendant pointed the gun at him. Mike asked if his family could go upstairs, which defendant permitted. He then ordered Uwe into a nearby bedroom. There, defendant beat him with his fists and a pair of gloves filled with size D-cell batteries. He struck Uwe 50 to 100 times on his face and body, refusing to stop until Uwe finally told him where to find the television.

Defendant bound Uwe's hands and legs with duct tape then left with Mike to reclaim the television. Retrieval efforts were unavailing. Defendant returned to the house, gave the gun to Phillips, then left again, leaving Phillips to guard the family. Mike asked Phillips to let them go, but she responded angrily that they were all going to die.

Defendant returned with three men. He rolled plastic sheeting over the bedroom floor and all four men took turns beating Uwe, hitting him with steel weights and choking him with a chain. After about an hour, the men emerged laughing. They were covered in Uwe's blood and dripping with sweat. One of the men said Uwe and Mike's family all had to die. Lisa and Mike begged to be released, promising to pay for the television or give the men anything they wanted. When Mike offered his life in exchange for his children's freedom, he was brought into the room with Uwe and bound to a chair with duct tape. Blood and tissue covered the walls and floor. Uwe had been so severely beaten that he was unrecognizable. He was still breathing and occasionally moaned in pain. The men resumed the beating, forcing Mike to watch. At one point Uwe was forced to drink urine from a cup. Defendant brought his pit bull into the room, and, when the dog would not attack Uwe, defendant became angry and beat the animal with his fists. He choked Uwe with

3

the dog's collar and burned parts of Uwe's midsection with a blowtorch. Someone poured bleach over the wounds. Beyond an occasional moan, Uwe no longer reacted to the torment.

The men said they were going to let Lisa go and brought her and the baby into the room to say goodbye. Lisa and the children left with Nicole Thompson, a friend of the men assaulting Uwe. While Lisa and the children were held at Thompson's house, defendant arrived. He took Lisa and the baby to a nearby park but would not let the other children join them. Telling Lisa she "needed to give him some assurance that [she] wasn't going to say anything," defendant raped her. He said her family would be released but "Uwe wasn't going to be leaving." They picked up Lisa's older children and returned to defendant's house. There, defendant and Phillips argued about how to proceed. Phillips did not want to let Mike's family leave, but defendant protested, " 'Well, what are we going to do with all these bodies?' " Lisa heard the sound of a blowtorch and Uwe screaming.

Defendant sent Mike away with Phillips to look for a bicycle. By that point, the other men had left, and defendant was alone in the house with Lisa and the children. He raped Lisa a second time, then ordered her to help move Uwe's body, which was wrapped in plastic. Uwe was still alive but not fully conscious. He proved too heavy for defendant and Lisa to drag into the garage. As they struggled with the body, Mike and Phillips returned. Mike helped defendant put Uwe in the backseat of defendant's car. Defendant and Phillips discussed burying Uwe in the desert and using lye to dissolve the body.

Phillips ordered Lisa to clean up bloodstains in the house. Defendant and Phillips then drove away with Uwe, telling Mike

4

and his family to leave in their own car. Mike and Lisa ultimately called the police.

The next morning, Uwe's body was found in a concrete drainage ditch along the 91 freeway. There were bloodstains on a guardrail and a length of bloody, knotted rope lay near the road's shoulder. Four .380-caliber bullet casings and one intact bullet were found near the body.

A search of defendant's house revealed numerous blood smears and drippings, bloody gloves, a roll of plastic sheeting, and torn pieces of duct tape. There was a hole in the drywall surrounded by blood and hair, with a bottle of bleach nearby. A half-empty box of .380 bullets was found inside a purse. Several pieces of bloody cloth and bits of duct tape were found in defendant's car, along with seven live .380-caliber rounds in the glove box.

An autopsy revealed that Uwe's body was riddled with injuries. He had sustained multiple blunt force injuries to his face, head, and body. His ribs, skull, jaw, nose, and other facial bones were fractured. Teeth that had been knocked out were found loose in his mouth. A ligature mark on his neck was consistent with strangulation by a chain. A shoe imprint on his back was consistent with "stomping." It was also possible he was burned. Uwe had been shot in the head five times at close range. A .380-caliber bullet was extracted from his knee.

2. *Victim Impact*

Mike and Lisa's relationship did not survive the trauma of the incident. Mike became angry and abusive, suffering nightmares and replaying the events in his mind. Lisa's life went into a "downhill spiral" and was never the same after the incident. Even ten years later and after two and a half years of

counseling, she still had nightmares and was afraid of people. The children were also traumatized. The oldest child was removed from the home because he had violent episodes and ran around the house stabbing things with a knife. Mike missed Uwe, his only brother.

Uwe's mother, Helga Durbin-Axt, described his childhood in West Germany. Uwe had an older sister and was especially close to his brother Mike. The family often gathered for a meal on Sundays. Uwe had been in the United States for a year and a half but had decided to move back to Germany. His murder was very difficult for the family. They flew his body home for burial, but Helga was not allowed to look at him. Mike was very affected by the crimes, and Helga was raising his son Matthew. She missed Uwe terribly.

### 3. *Prior Crimes*

Katri K. met defendant soon after she came to the United States from Finland in 1992. She was 21 years old. Once they began dating, she lived with defendant and his mother. Katri and defendant had violent arguments during which he assaulted her. During one argument, he choked her into unconsciousness. After another violent quarrel, defendant hit, raped, and sodomized her. The next day, a friend took Katri to the hospital, where she was interviewed by police. Katri eventually returned to Finland.

In 1996, a couple reported that their car had been shot at by someone in another car. Both identified defendant as the shooter, but neither was willing to so testify.

### B. *Defense's Mitigating Evidence*

Defendant presented extensive evidence of his difficult upbringing. He was conceived when his mother, Marsha, was

raped at age 12 or 13 by a family friend. His father eventually married Marsha, had another child with her, and moved the family from Indiana to Los Angeles. Defendant's father physically abused Marsha, who frequently ran away with the children. Once, his father choked Marsha and said she would not live to see 18. She eventually divorced him and married defendant's stepfather, Michael Woodson.

Woodson was a criminal and a drug addict. He and Marsha made money from credit card fraud, sometimes enlisting defendant to help them. There were guns and drugs in the house. When defendant was 10 or 11 years old, Woodson began beating him with his fists. He was once jailed for domestic violence. When defendant was a teenager, Woodson was accused of murder. He was tried three times and ultimately acquitted. Defendant was interviewed by the police and had to testify at Woodson's trial.

During this period, Marsha frequently sent her children to Indiana to be cared for by their grandparents. As a result, defendant attended ten different schools in Los Angeles and was placed in special education classes due to his behavioral problems and difficulty reading. His third-grade teacher reported that he had 21 absences, was frequently late, and did not get along with adults or other children. Defendant also had trouble at the school in Indiana. He was nervous and fidgety because he was worried about his mother being abused in his absence.

Several children, both relatives and foster children, lived with defendant in his grandparents' home. They were disciplined severely for even minor transgressions. Defendant's grandmother whipped the children with various implements

and sometimes locked them in a small furnace room. One child was forced to sit in the hallway with a urine-soaked sheet over her head and had her hand held to the furnace flame. Another was hit on the head with a butcher knife. A third was forced to eat on the floor.

A substantial amount of penalty phase testimony described the misdeeds of defendant's biological father, Lester Wilson, Sr. (Wilson), although it is unclear how much time defendant spent with him. Defendant and his sister were not allowed to visit their father but sometimes skipped school and went to his house. During one visit, Wilson got defendant drunk, then tried to molest defendant's sister. Wilson sexually abused one of defendant's half-sisters when she was 12 and violently raped her when she was 16. He sexually abused another half-sister, took her along on a drive-by shooting, and once appeared to kill a man in front of her. He later went to prison for murdering a woman who was pregnant with his child. Defendant's half-sister testified that Wilson had picked her up and taken her to a McDonald's while the woman lay dead in the car.

Several family members expressed love for defendant and stayed in contact with him while he was in prison. His grandmother frequently sent photos of defendant's 15-year-old daughter, whom she was raising. The daughter often wrote and visited defendant in jail and prison. He advised her to stay in school, pursue a career, and not repeat his mistakes. A half-brother, 25 years younger than defendant, described happy moments and testified that defendant helped him with reading and homework, drove him to football practice, and attended his games. Defendant continued to give him advice from jail, serving as a kind of surrogate father. Similarly, a half-sister,

more than 20 years defendant's junior, frequently sought his advice about life, parenting, and relationships.

## II. DISCUSSION

### A. *Double Jeopardy*

Defendant contends this penalty retrial violated state and federal constitutional protections against double jeopardy. The claim is contrary to settled law. Because defendant's original death judgment was reversed for legal error, and the reversal was not the equivalent of an acquittal, double jeopardy principles do not bar retrial.

#### 1. *Background*

Defendant's first jury returned a death verdict. On automatic appeal, he argued the trial court erroneously dismissed a juror during penalty phase deliberations. We agreed and reversed the penalty verdict while upholding the guilt judgment. (*Wilson*, *supra*, 44 Cal.4th at p. 842.) Briefly stated, the facts concerning the penalty reversal are as follows.[5]

Juror No. 5 was the only juror in the previous trial who, like defendant, was African-American. (*Wilson*, *supra*, 44 Cal.4th at p. 813.) He joined the unanimous jury in convicting defendant on all counts in the guilt phase. (*Ibid.*) During penalty phase deliberations, Juror No. 5 had initially leaned toward the death penalty but later announced he had changed his mind and favored a life sentence. (*Id.* at p. 814.) He became the sole holdout for life imprisonment. (*Ibid.*) The next day, Juror No. 1 sent the court a note accusing Juror No. 5 of

---

[5]     At defendant's request, we have taken judicial notice of all filings in his prior appeal (S089623) and a related habeas corpus proceeding (S152074).

misconduct for considering facts not in evidence, discussing the case with a juror before deliberations, telling other jurors they could not understand his position because they were not Black, and refusing to follow the court's instruction that death is a penalty worse than life imprisonment. (*Id.* at pp. 815–816.) After discussing the note with counsel, the court examined each juror individually then made a detailed ruling. (*Id.* at p. 816.)

First, although Juror No. 5 had said in voir dire that he would ignore race in reaching a decision, the court recalled that the juror's demeanor was evasive. (*Wilson*, *supra*, 44 Cal.4th at p. 817.) Second, the court credited Juror No. 1's account of hearing Juror No. 5 say, after Mike's guilt phase testimony, " ' "How can you hold someone responsible for their actions?" ' " and " ' "This is what you expect when you have no authority figure." ' " (*Ibid.*) Third, the court found that Juror No. 5 made a number of statements during penalty deliberations referencing race and asserting other jurors could not understand evidence about defendant's background because they were not Black. (*Id.* at p. 818.)[6] Finally, although Juror No. 5 may have made statements to the contrary, the court was satisfied that the juror could follow the instruction stating death is a worse punishment than life imprisonment without the possibility of parole. (*Ibid.*) Based on its factual findings, the court concluded Juror No. 5 had concealed his racial views in voir dire, prejudged the penalty decision without evidentiary

---

[6] Statements attributed to Juror No. 5 included, for example: " ' "Black people don't admit being abused" ' "; " ' "Black kids have a different relationship with their fathers" ' "; and, regarding evidence of defendant's childhood abuse, " ' "I know . . . more went on than we were shown." ' " (*Wilson*, *supra*, 44 Cal.4th at p. 818.)

basis, and improperly considered race and racial stereotypes in violation of the instructions. (*Id*. at pp. 819–820.) It dismissed the juror for misconduct. (*Id*. at p. 820.)

The next day, Juror No. 5 was replaced by an alternate, Juror No. 17. Shortly after deliberations resumed, the jury sent a note informing the court that the new juror " 'is unable to give the death penalty' " and " 'feels very strongly about this.' " When questioned, Juror No. 17 explained that his views on the death penalty had changed over the course of the trial. He now realized his "conscience and the law conflict," making it impossible for him to vote for the death penalty. His view was based not on the circumstances of this particular case but on his strongly held religious beliefs. He explained that he had weighed the aggravating and mitigating evidence but found himself incapable of imposing the death penalty due to feelings grounded in his Catholic faith. The court found him disqualified, excused him, and replaced him with another alternate. The next day, the jury returned a verdict fixing the penalty at death.

We concluded the trial court erred in dismissing Juror No. 5. The record did not establish that the juror had intentionally concealed information, and any unintentional concealment of his views did not render him unable to perform his duty as a juror. (*Wilson*, *supra*, 44 Cal.4th at pp. 823–824.) "Juror No. 5's particular view of the evidence, refracted through the prism of his own experience as an African-American man who had raised a son, showed neither a refusal to deliberate nor an inability to perform his duty as a juror *to a demonstrable reality*." (*Id*. at p. 824.) Nor did the juror improperly rely on facts not in evidence. Rather, he merely relied "on his life experiences to interpret the evidence presented." (*Id*. at p. 825.)

11

Interpreting evidence based on a juror's own life experiences, we explained, is not misconduct in the penalty phase of a capital trial. (*Id.* at pp. 830–831.) Finally, the record demonstrated that Juror No. 5 could follow an instruction to treat death as the most severe penalty (*id.* at pp. 834–836) and did not establish that the juror had prejudged the penalty question (*id.* at pp. 840–841). Although discharging Juror No. 5 did not affect the guilt verdict, it required reversal of the penalty judgment. (*Id.* at pp. 841–842.) This disposition rendered it unnecessary for us to address defendant's claim that the court also erred in dismissing Juror No. 17. (*Id.* at p. 841, fn. 19.)

After the remittitur issued, defendant filed a motion asserting that constitutional double jeopardy principles barred the prosecution from retrying the penalty phase. The trial court denied the motion based on *People v. Hernandez* (2003) 30 Cal.4th 1 (*Hernandez*), which it found to be controlling.

2. *Discussion*

The Fifth Amendment of the United States Constitution states that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." (U.S. Const., 5th Amend.) To the same effect, the California Constitution declares that "[p]ersons may not twice be put in jeopardy for the same offense." (Cal. Const., art. I, § 15.) Although the California double jeopardy clause may provide greater protection than the Fifth Amendment in some circumstances (see, e.g., *People v. Batts* (2003) 30 Cal.4th 660, 692), the California provision is generally interpreted consistently with its federal counterpart absent cogent reasons for a departure. (See *id.* at pp. 686–687; *People v. Eroshevich* (2014) 60 Cal.4th 583, 588 (*Eroshevich*).) We need not defer to federal decisions, however, when the

United States Supreme Court has not yet decided the parallel question under the federal Constitution. (See *People v. Buza* (2018) 4 Cal.5th 658, 686.)

"At its core, the double jeopardy clause 'protect[s] an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense.' (*Green v. United States* (1957) 355 U.S. 184, 187 [2 L.Ed.2d 199, 78 S.Ct. 221].) The policy underlying the double jeopardy protection 'is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual . . . thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity.' (*Id.* at p. 187.)" (*Eroshevich, supra*, 60 Cal.4th at p. 588.)

Whether double jeopardy principles bar a second prosecution depends on how the first trial ended. "An acquittal is accorded special weight." (*United States v. DiFrancesco* (1980) 449 U.S. 117, 129 (*DiFrancesco*).) "The constitutional protection against double jeopardy unequivocally prohibits a second trial following an acquittal" (*Arizona v. Washington* (1978) 434 U.S. 497, 503), because permitting a second trial, "however mistaken the acquittal may have been, would present an unacceptably high risk that the Government, with its vastly superior resources, might wear down the defendant so that 'even though innocent he may be found guilty.' " (*United States v. Scott* (1978) 437 U.S. 82, 91 (*Scott*).)

The result may be different if the first trial ends in a conviction that is later overturned. "It has long been settled . . . that the Double Jeopardy Clause's general prohibition against successive prosecutions does not prevent the government from

retrying a defendant who succeeds in getting his first conviction set aside, through direct appeal or collateral attack, because of some error in the proceedings leading to conviction." (*Lockhart v. Nelson* (1988) 488 U.S. 33, 38 (*Lockhart*); see *DiFrancesco*, *supra*, 449 U.S. at p. 131; *United States v. Jorn* (1971) 400 U.S. 470, 484 (*Jorn*).) Two policy considerations underlie this rule. First, "society would pay too high a price 'were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction.' " (*Tibbs v. Florida* (1982) 457 U.S. 31, 40.) Second, requiring retrial after a reversal on appeal "is not the type of governmental oppression targeted by the Double Jeopardy Clause." (*Ibid.*; see *Scott*, *supra*, 437 U.S. at p. 91.) California courts have identified an additional rationale: "By seeking reversal of a judgment of conviction on appeal, ' "[i]n effect, [a defendant] assents to all the consequences legitimately following such reversal, and consents to be tried anew." ' " (*Eroshevich*, *supra*, 60 Cal.4th at p. 591.) If the appeal of a conviction is successful, "retrial simply 'affords the defendant a second opportunity to seek a favorable judgment' and does not violate the constitutional prohibitions against double jeopardy." (*People v. Hatch* (2000) 22 Cal.4th 260, 274 (*Hatch*); see *Lockhart*, at p. 42.) Permitting a retrial under these circumstances provides a defendant with the fair trial to which he is entitled, unaffected by the prejudicial error that tainted the original proceedings.

A settled exception to this rule permitting retrial after a successful appeal occurs when a conviction has been reversed due to insufficiency of the evidence. (*DiFrancesco*, *supra*, 449 U.S. at p. 131; see *Burks v. United States* (1978) 437 U.S. 1, 16.) "When the evidence is legally insufficient, it means that ' "the

government's case was so lacking that it should not have even been *submitted* to the jury." ' " (*Eroshevich, supra,* 60 Cal.4th at p. 591.) But the high court has stressed that "a reversal based solely on evidentiary insufficiency has fundamentally different implications, for double jeopardy purposes, than a reversal based on . . . ordinary 'trial errors.' " (*Lockhart, supra,* 488 U.S. at p. 40.) "While the former is in effect a finding 'that the government has failed to prove its case' against the defendant, the latter 'implies nothing with respect to the guilt or innocence of the defendant,' but is simply 'a determination that [he] has been convicted through a judicial *process* which is defective in some fundamental respect.' " (*Ibid.*)

In *Hernandez, supra,* 30 Cal.4th 1, we considered how these principles apply when a conviction has been reversed due to the improper discharge of a seated juror. Near the end of Hernandez's trial for child sexual abuse, a juror told the court she was "bothered" by the prosecutor's tone in cross-examining a defense witness and believed the prosecutor and judge had been "smirking or making faces" during the witness's testimony. (*Id.* at p. 4.) She said she could be fair but expressed disappointment with " 'certain aspects' of the trial." (*Ibid.*) Based on these remarks and the juror's " 'body language,' " the trial court determined the juror could not be fair to the People and discharged her from the panel. (*Ibid.*) The juror was replaced with an alternate and Hernandez was convicted. (*Ibid.*) The Court of Appeal reversed. It concluded removing the juror was akin to granting an unnecessary mistrial, thus implicating double jeopardy principles. (*Id.* at pp. 4–5; see *Curry v. Superior Court* (1970) 2 Cal.3d 707, 717.)

We granted review and disagreed with the Court of Appeal's double jeopardy holding. (*Hernandez, supra,* 30

Cal.4th at p. 6.) Our analysis began with the general rule that "the double jeopardy guarantee imposes no limitation on the power to retry a defendant who has succeeded in having his conviction set aside on appeal on grounds other than insufficiency of evidence." (*Ibid*.) If sufficient evidence exists to support a conviction, we noted, retrial does not oppress the defendant but provides a renewed opportunity for the defendant to obtain a fair trial free from error. (*Id*. at p. 7; see *Lockhart*, *supra*, 488 U.S. at p. 42.) Moreover, as the high court had observed in *DiFrancesco*, *supra*, 449 U.S. at page 131 and *United States v. Tateo* (1964) 377 U.S. 463, 466 (*Tateo*), "it would be a ' "high price indeed for society to pay" ' if reversible trial errors resulted in immunity from punishment." (*Hernandez*, at p. 8.)

Policy concerns raised by Hernandez and the Court of Appeal did not support a departure from this rule. Cases discussing a defendant's " 'valued right to have his trial completed by a particular tribunal' " (*Crist v. Bretz* (1978) 437 U.S. 28, 36 (*Crist*)) simply concerned the rule that jeopardy attaches when a jury is empaneled and sworn (see *id*. at p. 35). Other cited cases considered the double jeopardy consequences of granting an unnecessary mistrial (see *Stone v. Superior Court* (1982) 31 Cal.3d 503, 516, abrogated in part by *Blueford v. Arkansas* (2012) 566 U.S. 599). (*Hernandez, supra*, 30 Cal.4th at p. 8.) The cited cases did not stand for the broad "proposition that [a] defendant becomes immune from further prosecution merely because one particular juror is improperly discharged, an alternate substituted, and an actual verdict duly entered." (*Ibid*.) An alternate juror is, after all, part of the same jury selected by the defendant. (*Id*. at p. 9.) Thus, even if it is unauthorized, substitution of a regular juror with an alternate

does not deprive the defendant of his chosen jury. (*Ibid*.) Nor were we persuaded that the discharge of Hernandez's juror gave the prosecution "any concrete advantage" (*ibid*.), considering the juror's assurances that she could be fair to both sides. Finally, we discounted the Court of Appeal's fear that, absent a bar to retrial, the discharge of jurors sympathetic to the defense " 'could become routine.' " (*Id*. at p. 10.) The concern was "both unrealistic and unfair," we noted, because it presumed trial judges would concur in such discharges and expose their judgments to routine reversals. (*Ibid*.)

Accordingly, we held that "*error in discharging a juror should be treated no differently from any other trial error leading to reversal on appeal*, such as prejudicial instructional or evidentiary error or ordinary prosecutorial misconduct." (*Hernandez*, *supra*, 30 Cal.4th at p. 10, italics added.) In view of the clear and settled law "that, as a general rule, errors other than insufficiency of evidence do not preclude retrial following reversal of conviction" (*ibid*.), we concluded double jeopardy principles did not bar retrial (*id*. at p. 11). A concurrence by Justice Werdegar urged a narrow construction of this holding. She observed that the double jeopardy consequences of the error might have differed "had the trial court dismissed more than a single juror, had it not replaced the discharged juror with a sworn alternate, had the court reopened voir dire and permitted additional peremptory challenges, or had the court's purpose in discharging the juror been to influence the verdict." (*Id*. at p. 13 (conc. opn. of Werdegar, J.).)

We have not previously addressed whether *Hernandez* applies to retrial following the improper discharge of a juror from the penalty phase of a capital trial. Forty years before *Hernandez*, *People v. Hamilton* (1963) 60 Cal.2d 105,

disapproved in part in *People v. Daniels* (1991) 52 Cal.3d 815, held that the erroneous dismissal of a juror during a capital trial's penalty phase warranted reversal. Although mindful of the time and expense a new penalty trial would likely involve, we remanded with specific directions that such a retrial be conducted. (*Hamilton* at p. 138.) The issue of double jeopardy was not raised or addressed, however. More recently, *People v. Armstrong* (2016) 1 Cal.5th 432 held that the improper removal of a juror during *guilt phase* deliberations of a capital trial warranted reversal of the entire judgment. Citing *Hernandez*, this court held unanimously and unequivocally: "There is no double jeopardy bar to retrial of the case" (*id.* at p. 454), under either the federal or state constitutions (*id.* at p. 460).

We now make explicit what was implicit in *Armstrong*'s holding: As a general rule, the erroneous discharge of a capital juror is no different from any other trial error warranting reversal of judgment, and double jeopardy protections impose no obstacle to retrial. (See *Hernandez, supra*, 30 Cal.4th at p. 10.) Unlike a reversal for insufficiency of the evidence, the erroneous removal of a single juror cannot be analogized to an acquittal. Retrial of the penalty phase after such an error does not place the defendant twice in jeopardy; rather, it provides a second opportunity for a trial free from prejudicial error. (See *Hatch, supra*, 22 Cal.4th at p. 274.)

Defendant urges us to depart from *Hernandez*, either in all capital cases or in his particular circumstances. The arguments are unpersuasive.

Defendant first broadly asserts *Hernandez*'s holding should not extend to penalty retrials. His suggestion that double jeopardy protections apply with different or greater force

in capital cases is belied by United States Supreme Court precedent, however. *Bullington v. Missouri* (1981) 451 U.S. 430, 439 confirmed that the double jeopardy clause applies to capital-sentencing proceedings that "have the hallmarks of the trial on guilt or innocence." In this context, a verdict of life imprisonment signifies that the jury has found that the predicate for imposing a death sentence has not been established. "A verdict of acquittal on the issue of guilt is, of course, absolutely final. The values that underlie this principle . . . are equally applicable when a jury has rejected the State's claim that the defendant deserves to die." (*Id.* at p. 445.) In that event, the jury's rejection of the state's case for the death penalty is the functional equivalent of an acquittal on the state's separate charge that the death penalty is called for. However, the double jeopardy bar to retrial applies only if the "first life sentence was an 'acquittal' based on findings sufficient to establish legal entitlement to the life sentence." (*Sattazahn v. Pennsylvania* (2003) 537 U.S. 101, 108 (*Sattazahn*).) In *Sattazahn*, the defendant was sentenced to life imprisonment in accordance with a Pennsylvania statute requiring such a disposition when his jury *deadlocked* at the penalty phase. (*Id.* at pp. 103–104.) After his murder conviction was reversed on appeal, he was retried and sentenced to death. (*Id.* at p. 105.) *Sattazahn* asserted double jeopardy precluded the imposition of this more severe sentence in the second trial, but the high court disagreed. It stressed that "the touchstone for double-jeopardy protection in capital-sentencing proceedings is whether there has been an 'acquittal,' " and neither the first jury's deadlock on penalty nor the trial judge's entry of a life sentence in accordance with the Pennsylvania statute constituted an acquittal. (*Id.* at p. 109.)

19

Here, defendant's first penalty trial did not result in an acquittal or its equivalent. He was sentenced to death. When the death penalty has been imposed, reversal of that judgment on appeal generally does not bar retrial unless the reviewing court determines the evidence was "legally insufficient to justify imposition of the death penalty." (*Poland v. Arizona* (1986) 476 U.S. 147, 157.) Reversal of the penalty judgment in defendant's first automatic appeal was not based on insufficient evidence. Instead, we reversed because of the erroneous excusal of a juror. (*Wilson*, *supra*, 44 Cal.4th at pp. 841–842.) That reversal was not the equivalent of an "acquittal" for double jeopardy purposes. (See *Poland*, at p. 157.) Because neither the jury nor this court "acquitted" defendant in his first trial, double jeopardy did not bar his retrial. (See *Sattazahn*, *supra*, 537 U.S. at p. 109.)

Ignoring these authorities or dismissing their relevance, defendant argues various policy and practical considerations counsel against extending *Hernandez* to penalty retrials. He notes that cases limiting double jeopardy protections have typically stressed the high cost to society if trial errors could result in a defendant's complete immunity from punishment. (See, e.g., *DiFrancesco*, *supra*, 449 U.S. at p. 131; *Hernandez*, *supra*, 30 Cal.4th at p. 8.) Barring penalty retrials would not allow capital defendants' conduct to go unpunished, defendant observes, because they would still have to serve a life sentence. But it is settled that the law considers the death penalty to be a more severe punishment than life in prison. (See *Woodson v. North Carolina* (1976) 428 U.S. 280, 305 (*Woodson*); *People v. Hernandez* (1988) 47 Cal.3d 315, 362.) Under defendant's broad notion of double jeopardy, any reversible trial error in the penalty phase would automatically render a defendant immune

from the death penalty. This result finds no support in either California or federal law. Some states, like Pennsylvania, prohibit a penalty retrial when the first jury cannot reach a verdict. Of course, they are free to do so, but California has not adopted such a policy.

Defendant also cites the practical impediments to penalty retrials, but these complaints suffer from the same shortcoming. Defendant observes that, due to delays inherent in the appellate process, penalty retrials will typically occur several years after the original trial. Memories may fade; witnesses may become unavailable; evidence may be lost or destroyed. Conversely, retrial gives the prosecution an opportunity to present "new or better evidence" in support of its position. For example, defendant notes, a new forensic pathologist testified in his second penalty trial about signs that Uwe may have been burned with a blowtorch, contrary to expert testimony in the first trial. Finally, defendant urges that barring penalty retrials would bring closure to victims and financial savings to the criminal justice system. Yet these arguments apply to *all* retrials after reversal of a judgment on appeal. There will always be a period of delay, and the resulting difficulties with witnesses and evidence are likely to impact the prosecution as well as the defense. The defense also has the same opportunity as the prosecution to marshal new and favorable evidence. And, while barring retrials would more expeditiously end criminal proceedings, these benefits have never been considered sufficient to make society pay the "high price" of reducing or eliminating a statutorily prescribed punishment due to trial errors. (*Tateo, supra*, 377 U.S. at p. 466.)

Defendant posits two additional reasons for distinguishing *Hernandez*. Whereas the dismissed juror in *Hernandez* did not

obviously favor the defense and said she "was . . . 'committed to being fair' " (*Hernandez, supra,* 30 Cal.4th at p. 10), Juror No. 5 was the lone holdout for life imprisonment. Defendant contends discharging him gave the prosecution a clear advantage. That is so, and that is why the penalty verdict was reversed. But the cases are indistinguishable on the point in question. In each, the removal of a juror was prejudicial error, and the remedy was the same: reversal, with a remand for a new trial.

Additionally, defendant notes that only one juror was dismissed in *Hernandez,* whereas the trial court dismissed two jurors in his prior trial. He attaches significance to this difference because Justice Werdegar's concurrence in *Hernandez* stated the double jeopardy result might have been different if, inter alia, "the trial court [had] dismissed more than a single juror." (*Hernandez, supra,* 30 Cal.4th at p. 13 (conc. opn. of Werdegar, J.).) Read in context, however, it is clear this statement was meant to contrast the removal of a single juror with the more problematic situations in which multiple jurors are improperly discharged or an empaneled juror is replaced with someone from the venire rather than a sworn alternate. (See *id.* at pp. 12–13.)[7] Here, as in *Hernandez,* the court dismissed a single juror and replaced him with a sworn

---

[7] The concurrence posited that different scenarios might produce different double jeopardy consequences. It observed: "Retrial would of course be prohibited if defendant's entire chosen jury of 12 persons had been improperly discharged against his wishes. Does the same rule apply if only a single juror is improperly discharged?" (*Hernandez, supra,* 30 Cal.4th at p. 12 (conc. opn. of Werdegar, J.).) While finding it unnecessary to make a global pronouncement, the concurrence went on to consider a circumstance in which the replacement juror was not drawn from among the sworn alternates. (*Ibid.*)

alternate. Almost immediately, that alternate, Juror No. 17, was dismissed for reasons unrelated to the dismissal of Juror No. 5. The seat was then filled with another sworn alternate. Defendant spends considerable effort arguing that the discharge of Juror No. 17 was error, but we did not reach that question in defendant's prior appeal and need not reach it now. Even if the court had erred a second time in discharging Juror No. 17, the remedy would have been the same. Defendant was entitled to reversal of the judgment, an outcome he received. No authority suggests double jeopardy bars retrial if the trial court commits more than one reversible error. Moreover, because "an alternate juror, even if improperly seated, is part of the same jury chosen by the defendant" (*Hernandez*, at p. 9), the substitution of a new alternate for Juror No. 17 did not deprive defendant of his " 'valued right to have his trial completed by a particular tribunal' " (*Crist*, *supra*, 437 U.S. at p. 36).

Finally, defendant asserts double jeopardy protections barred retrial because "the trial court manipulated the penalty phase jury to ensure a death verdict." The court below impliedly rejected this claim when it denied defendant's plea of once in jeopardy. Substantial evidence supports that finding. The court in defendant's first trial undertook a careful and thorough inquiry of the entire panel before dismissing Juror No. 5 (see *Wilson*, *supra*, 44 Cal.4th at pp. 816–822) and questioned Juror No. 17 at length before determining he was unqualified to serve for an unrelated reason (see *ante*, at pp. 11−12). Assuming judicial misconduct of this nature could trigger a double jeopardy bar to retrial (see *Jorn*, *supra*, 400 U.S. at p. 485, fn. 12 [reserving this possibility]), we defer to the trial court's implied factual finding that no such misconduct occurred.

B. *Due Process*

Defendant separately contends the penalty retrial violated due process because it failed to satisfy the heightened reliability required of capital cases. (See *Woodson, supra,* 428 U.S. at p. 305.) A similar claim was raised in *Sattazahn*, and the high court rejected it as "nothing more than [the] double-jeopardy claim in different clothing." (*Sattazahn, supra,* 537 U.S. at p. 116.) The same is true here.

Defendant offers no support for his assertion that the penalty retrial deprived him of a fair opportunity to challenge the prosecution's case or assert his own position that death was an inappropriate penalty in his particular circumstances. Defendant was aware of the prosecution's strategy from the first trial; he was represented by the same attorney in both cases; he had adequate time to prepare; and he presented a robust mitigation defense through multiple witnesses.

Rather than pointing to any deficiency in the retrial proceeding, defendant instead renews his complaint that the court in his first trial erred by dismissing the alternate (Juror No. 17) called to replace Juror No. 5. But defendant "already has been afforded a new penalty phase trial free from such error," and *that* is the judgment now before us. (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1207.) As discussed, the discharge of Juror No. 17 did not deprive defendant of his chosen jury because the juror was replaced with *another* sworn alternate. Attempting to shoehorn his facts into one of the possible double jeopardy exceptions noted in Justice Werdegar's *Hernandez* concurrence, defendant claims the discharge of Juror No. 17 "was remarkably similar to reopening voir dire." (See *Hernandez, supra,* 30 Cal.4th at p. 13 (conc. opn. of Werdegar,

J.).)  But that assertion is belied by the facts.  The court did not reopen voir dire, nor did it grant or permit the use of any extra peremptory challenges.  It simply discharged a juror who found it "impossible" to impose the death penalty and seated another sworn alternate.  Any error the court may have made in discharging Juror No. 17 was remedied by our reversal of defendant's first death judgment.

Retrial of the penalty phase did not violate double jeopardy, and defendant has failed to support a due process claim.  Like the United States Supreme Court, "[w]e decline to use the Due Process Clause as a device for extending the double jeopardy protection to cases where it otherwise would not extend." (*Dowling v. United States* (1990) 493 U.S. 342, 354; see *People v. Barragan* (2004) 32 Cal.4th 236, 244.)

C.  *Counsel's Conflict of Interest*

Defendant claims the court erred in failing to inquire about defense counsel's conflict of interest upon learning that defendant had raised ineffective assistance of counsel claims in a pending habeas corpus petition.  He also faults the court for failing to explore whether he wanted to obtain substitute counsel.  We conclude both claims lack merit on this record.

Michael Belter represented defendant in his first trial.  A county agency that secures counsel for indigent defendants arranged for Belter to represent defendant in the retrial and sought his appointment.  The court observed it would be sensible for Belter to handle the case again, and the prosecution agreed it would be the most efficient way to proceed.  Advised of the impending appointment, defendant wanted to see Belter and requested a transfer to the Riverside jail to facilitate their meetings.  When the court asked if appointing Belter and

cocounsel Christopher Harmon would be agreeable to defendant, he responded, "Well, I can't really say nothing 'til they show up." At the next hearing on January 9, 2009, the parties discussed scheduling a trial readiness conference. The court asked if defendant had been able to meet with Belter, and defendant said, "Yes, actually, I have an objection to Mr. Belter. But since he's not here, I really don't want to raise it." The court responded that defendant could "take that up with counsel or wait until the next hearing."

Belter made his first appearance for defendant six weeks later, on February 20, 2009, at a trial readiness conference. Belter advised the court that defendant had filed a habeas corpus petition related to his first trial and that petition was pending in this court. Belter wanted to meet with appellate and habeas counsel before proceeding further. Defendant apparently attempted to speak at that point because the court interrupted itself to say: "You need to talk to your attorney, sir, before you address the Court." The record does not indicate whether defendant spoke to Belter or cocounsel Harmon, but Belter next responded: "Mr. Wilson — he's conferred with me this morning. He wants the Court to be aware that there are pending issues with respect to the guilt phase of his case, competency of trial counsel in that proceeding, and other issues. And those are in the habeas petition that is still pending before the Supreme Court."

At the next hearing, Belter noted that, although the penalty phase issues raised in defendant's habeas corpus petition had been mooted by our decision reversing the penalty judgment, issues related to the guilt phase remained unresolved. He was reluctant to proceed with trial before obtaining a decision on these claims. After some discussion, the

parties settled on a trial date in January 2010. That date was later continued for various reasons, including to permit resolution of the pending habeas corpus petition. Defendant's petition raised 29 claims, four of which alleged ineffective assistance of counsel during the guilt phase of trial. The petition was denied on June 30, 2010. Jury selection in defendant's retrial began on October 13, 2010.

Beyond his inchoate objection before Belter appeared on his behalf, defendant made no explicit request to discharge his attorney or to have a new attorney appointed. He now contends the trial court was on notice that Belter had a conflict of interest and its failure to inquire about the conflict requires reversal. We find no reversible error.

"A criminal defendant is guaranteed the right to the assistance of counsel by the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution. This constitutional right includes the correlative right to representation free from any conflict of interest that undermines counsel's loyalty to his or her client. [Citations.] 'It has long been held that under both Constitutions, a defendant is deprived of his or her constitutional right to the assistance of counsel in certain circumstances when, despite the physical presence of a defense attorney at trial, that attorney labored under a conflict of interest that compromised his or her loyalty to the defendant.' [Citation.] 'As a general proposition, such conflicts "embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or his own interests. [Citation.]" ' " (*People v. Doolin* (2009) 45 Cal.4th 390, 417.)

"Under the federal Constitution, prejudice is presumed when counsel suffers from an actual conflict of interest. (*Cuyler v. Sullivan* (1980) 446 U.S. 335 [64 L.Ed.2d 333, 100 S.Ct. 1708].) This presumption arises, however, 'only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." ' (*Strickland v. Washington* (1984) 466 U.S. 668, 692 [80 L.Ed.2d 674, 104 S.Ct. 2052], quoting *Cuyler*, at p. 348.) An actual conflict of interest means 'a conflict that affected counsel's performance — as opposed to a mere theoretical division of loyalties.' (*Mickens v. Taylor* (2002) 535 U.S. 162, 171 [152 L.Ed.2d 291, 122 S.Ct. 1237], italics omitted.) Under the federal precedents, which we have also applied to claims of conflict of interest under the California Constitution, a defendant is required to show that counsel performed deficiently and a reasonable probability exists that, but for counsel's deficiencies, the result of the proceeding would have been different." (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 309–310.)

When the trial court knows, or reasonably should know, of the possibility that defense counsel has a conflict of interest, it has a duty to inquire into the matter. (*Wood v. Georgia* (1981) 450 U.S. 261, 272; *People v. Bonin* (1989) 47 Cal.3d 808, 836.) Defendant claims the court was put on notice about the possibility of a conflict because he voiced "an objection" to Belter at a pretrial hearing before Belter's first appearance. But defendant declined to pursue the matter further. He did not specify what that objection was, or the basis for it. There was no reason for the court to presume it had anything to do with a potential conflict of interest.

28

Defendant also asserts the court should have become aware of a potential conflict because it was told defendant had a habeas corpus petition pending that alleged ineffective assistance of counsel claims from his first trial. We need not resolve whether the existence of pending ineffective assistance claims was sufficient to put the court on notice of a potential conflict. Even assuming the court should have inquired about a potential conflict, defendant fails to show prejudice. " 'When a defendant claims that a trial court's inquiry into a potential conflict was inadequate, the defendant still must demonstrate the impact of the conflict on counsel's performance.' [Citations.] 'Absent a demonstration of prejudice, we will not remand to the trial court for further inquiry.' " (*People v. Rices* (2017) 4 Cal.5th 49, 64; see *People v. Nguyen* (2015) 61 Cal.4th 1015, 1071.)

To demonstrate a prejudicial conflict of interest, a defendant must show that defense counsel was burdened by an actual conflict of interest that adversely affected counsel's performance. (*Mickens v. Taylor, supra*, 535 U.S. at p. 171; *People v. Perez* (2018) 4 Cal.5th 421, 435.) "When determining whether counsel's performance was ' "adversely affected" ' by the purported conflict under this standard, we consider whether ' "counsel 'pulled his punches,' i.e., whether counsel failed to represent defendant as vigorously as he might have, had there been no conflict." ' [Citation.] This analysis will often turn on choices that a lawyer could have made, but did not make. In order to determine whether those choices resulted from the alleged conflict of interest, we must analyze the record to determine whether a lawyer who did not face the same conflict would have made different choices as well as whether counsel's choices were the product of tactical reasons rather than the alleged conflict of interest." (*Perez*, at pp. 435–436.)

Defendant posits only one way the alleged conflict may have affected Belter's representation. Noting that one habeas claim asserted counsel was ineffective in failing to present a defense based on cognitive deficits or other mental impairments, defendant suggests Belter may have avoided developing such mitigation evidence in the retrial because doing so "might be viewed as an admission of his ineffective assistance originally." As noted, however, reversal of the penalty judgment had rendered moot all claims in the habeas corpus petition alleging ineffective assistance of counsel in the penalty phase.

Moreover, the record on appeal does not support defendant's speculation that Belter shaped his defense strategy to avoid an ineffective assistance finding. Contrary to defendant's assertion, the record indicates that Belter *did* pursue evidence supporting a neurological defense. Early in the proceedings, Belter obtained an order for defendant to be examined by a neuropsychologist. When testing could not be conducted because defendant was shackled, Belter obtained a second order requiring jail officials to use some other form of restraint so that defendant could be tested with his hands free. The results of that testing are not in the record, nor is there any other evidence to support defendant's claim that Belter failed to present a neurological defense due to a conflict of interest. We do not know the results of any neuropsychological examination, or what opinions the defense expert may have formed. Whatever those results, counsel may have reasonably decided to focus instead on defendant's social history as evidence in mitigation. As we noted in defendant's prior appeal, "It is not the typical American family in which a child is conceived by his father's rape of his mother when she was a preteen, the child's father is convicted of rape and attempted murder and sent to

prison, the child's stepfather is similarly tried for murder, and the child's stepfather beats the child to the point where the child suffers convulsions." (*Wilson, supra*, 44 Cal.4th at pp. 830–831.) Counsel took steps to evaluate the question of cognitive deficits and presented extensive mitigation, including detailed evidence of defendant's difficult childhood presented through 14 different witnesses, many of them family members. The record does not support defendant's assertion that counsel's performance was impaired by a conflict of interest.

In a related claim, defendant contends his unelaborated "objection" to Belter at the January 9 hearing was tantamount to a request for substitute counsel under *People v. Marsden* (1970) 2 Cal.3d 118. He argues the court's failure to inquire into this request was "reversible per se." On this record, the claim fails.

"The legal principles governing a *Marsden* motion are well settled." (*People v. Johnson* (2018) 6 Cal.5th 541, 572 (*Johnson*).) If a defendant who asserts inadequate representation seeks to discharge appointed counsel and obtain a substitute attorney, the court must allow the defendant to explain the basis for this contention and to present specific instances of counsel's inadequate performance. (*Ibid.*) For the duty to hold a *Marsden* hearing to be triggered, however, there must be " 'at least some clear indication by defendant,' either personally or through his current counsel, that defendant 'wants a substitute attorney.' " (*People v. Sanchez* (2011) 53 Cal.4th 80, 90; see *People v. Lucky* (1988) 45 Cal.3d 259, 281, fn. 8.) Equivocal statements of dissatisfaction do not suffice. (See, e.g., *People v. O'Malley* (2016) 62 Cal.4th 944, 1006.)

Defendant gave no clear indication he wanted a substitute attorney and never requested one. After obtaining a transfer so that he could be housed closer to Belter, and before Belter made his first appearance, defendant said, "I have an objection to Mr. Belter," but he explicitly declined to explain what his objection was or what remedy, if any, he sought. The court responded that defendant could "take that up with counsel or wait until the next hearing." Defendant did not renew his objection to Belter at the next hearing, nor did he request substitute counsel at any time thereafter.

Discussion of the pending habeas corpus petition, however, does make this a close call. At defendant's urging, Belter informed the court that the petition included unresolved ineffective assistance of counsel issues related to the guilt phase of trial. Certainly one plausible reason for making the court aware of the pending claims involving Belter, especially in light of defendant's earlier "objection," would have been to articulate grounds for requesting new counsel. Yet neither defendant nor Belter ever stated that defendant wanted substitute counsel, and we will not lightly assume that counsel violated his ethical and professional duties by failing to convey such a request by his client. Under the circumstances, defendant's bare statement that he had "an objection" does not constitute a clear indication that he wanted to obtain new counsel. Expressions of dissatisfaction with appointed counsel that might be inferred here were not sufficient to trigger the court's obligation to hold a *Marsden* hearing. (See *Johnson, supra*, 6 Cal.5th at pp. 572–574.) The burden is ultimately on the defendant to articulate his request. The trial court has an obligation to make a clear record and give a defendant the necessary latitude to request

the remedy being sought. At the same time, the court must take care not to interfere with the attorney-client relationship.

Defendant contends he would have expressed a desire for new counsel at the February 20 hearing but the trial court prevented him from speaking. Because the court was aware that he objected to Belter, defendant argues it was especially problematic for the court to admonish him that he was required to convey his comments through that very same attorney. If the court had in fact silenced defendant, or required him to speak only through Belter, we might agree that his rights to due process and effective counsel were implicated. However, the record does not bear out defendant's claim. Contrary to defendant's assertion, the court did *not* tell him he could speak only through his attorney. What the court said was: "You need to talk to your attorney, sir, *before you address the Court*." This direction was consistent with the court's advice to defendant at an earlier hearing. In a discussion of supplies defendant wanted at the jail, the court asked, "Was there anything else, sir?" then added, "Talk to your attorney first, make sure you're not going to say anything wrong."

Considering the precise words of the court's admonition, we conclude the record does not support defendant's assertion that the court prevented him from speaking up to object to his attorney. She simply gave him the prudent direction to talk to counsel "*before* [he] address[ed] the Court." This statement left open defendant's option to address the court directly after he had conferred with counsel. The next statement on the record was Belter's, however, explaining that defendant wanted the court to be aware there were pending habeas claims in the Supreme Court regarding "competency of trial counsel." After Belter complied with defendant's request, defendant made no

further effort to address the court. If the record had demonstrated that defendant was trying to make a *Marsden* motion and Belter elided or misrepresented defendant's feelings in his statement to the court, this might be a different case. But the factual basis for that conclusion does not appear here. The record on appeal contains no evidence Belter misrepresented defendant's feelings in his statement to the court, that defendant demonstrated any desire to speak further, or that he was prevented from raising the issue subsequently. Accordingly, defendant has failed to show the court committed reversible error.

D. *Challenges to Death Penalty Statute*

Defendant raises many challenges to the constitutionality of California's death penalty statute but acknowledges that we have previously rejected them. We decline his invitation to depart from our settled precedents, which hold:

The class of offenders eligible for the death penalty under section 190.2 is not impermissibly broad. (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 669 (*Beck and Cruz*); *People v. Potts* (2019) 6 Cal.5th 1012, 1060.) California's statutory special circumstances are not so numerous or expansive that they fail to perform their constitutionally required narrowing function. (*People v. Navarro* (2021) 12 Cal.5th 285, 345 (*Navarro*); *People v. Vargas* (2020) 9 Cal.5th 793, 837–838.)

Section 190.3, factor (a), which permits aggravation based on the circumstances of the crime, does not result in arbitrary or capricious imposition of the death penalty. (*Navarro, supra*, 12 Cal.5th at p. 345; *People v. Capers* (2019) 7 Cal.5th 989, 1013 (*Capers*).) The jury's consideration of unadjudicated criminal conduct in aggravation under section 190.3, factor (b) does not

violate due process or constitutional prohibitions against cruel and unusual punishment. (*People v. Morales* (2020) 10 Cal.5th 76, 113 (*Morales*); *People v. Hoyt* (2020) 8 Cal.5th 892, 954 (*Hoyt*).)

The capital jury's penalty decision is normative rather than factual. (*Beck and Cruz, supra*, 8 Cal.5th at p. 670.) For this reason, California's death penalty scheme does not violate the federal Constitution for failing to require written findings (*People v. Rhoades* (2019) 8 Cal.5th 393, 455 (*Rhoades*)); unanimous findings as to the existence of aggravating factors or unadjudicated criminal activity (*Morales, supra*, 10 Cal.5th at pp. 113–114); or findings beyond a reasonable doubt as to the existence of aggravating factors (other than section 190.3, factor (b) or (c) evidence), that aggravating factors outweigh mitigating factors, or that death is the appropriate penalty (*People v. Fayed* (2020) 9 Cal.5th 147, 213 (*Fayed*); *People v. Krebs* (2019) 8 Cal.5th 265, 350). The high court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, and *Hurst v. Florida* (2016) 577 U.S. 92 do not alter these conclusions. (*Navarro, supra*, 12 Cal.5th at p. 346; *Capers, supra*, 7 Cal.5th at pp. 1013–1014.)

The federal Constitution does not require intercase proportionality review. (*Hoyt, supra*, 8 Cal.5th at p. 955; *Rhoades, supra*, 8 Cal.5th at pp. 455–456.) To the extent defendant complains he was unconstitutionally denied intracase proportionality review, California provides such review upon request (see, e.g., *People v. Landry* (2016) 2 Cal.5th 52, 125; *People v. Virgil* (2011) 51 Cal.4th 1210, 1287), but defendant raised no such claim in this appeal. California's capital sentencing scheme does not violate international norms of human decency or the Eighth Amendment. (*People v. Suarez*

(2020) 10 Cal.5th 116, 189 (*Suarez*); *Navarro*, *supra*, 12 Cal.5th at p. 346.) Nor does the death penalty law violate equal protection by providing different procedures for capital and noncapital defendants. (*Fayed*, *supra*, 9 Cal.5th at p. 214; *Rhoades*, at p. 456.)

Finally, "considering the arguments in combination, and viewing the death penalty law as a whole, it is not constitutionally defective. . . . 'California's capital sentencing scheme as a whole provides adequate safeguards against the imposition of arbitrary or unreliable death judgments.' " (*People v. Anderson* (2018) 5 Cal.5th 372, 426; see *Suarez*, *supra*, 10 Cal.5th at p. 191.)

### E. *Restitution Fine*

At the conclusion of defendant's first trial, the probation department recommended a $10,000 felony restitution fine. The court, however, imposed a lesser fine of $4,000. Defendant did not object or offer evidence concerning his ability to pay, nor did he dispute the propriety of the fine in his first appeal. After the penalty retrial, the court questioned whether the amount of restitution fines and fees needed to be revisited. It expressed an inclination to simply adopt the previous orders fixing fines, fees, and restitution. Defense counsel asked that the court "not order *additional* restitution" without a hearing. When the subject was addressed at the next hearing, the prosecutor represented that defendant had been paying restitution pursuant to the original court order, and no additional costs had been submitted by the victims. He recommended that the court impose no further restitution. The court remarked, "Then I don't think I need to revisit restitution," and defense counsel responded, "Yes."

Defendant now contends that in setting the $4,000 restitution fine, the court failed to take account of his ability to pay. He asserts that there was an intervening change in Government Code section 13967, permitting consideration of ability to pay, and that he should benefit from this revision. (See *People v. Vieira* (2005) 35 Cal.4th 264, 305.) However, defendant's argument rests on a factual error. It is clear from the sentencing minutes and abstract of judgment that defendant's restitution fine was imposed under Penal Code section 1202.4, not Government Code section 13967. Section 1202.4 required consideration of ability to pay at all relevant times in defendant's case. When defendant committed his crimes in 1997, when he was sentenced for them in 2000, and when he was resentenced in 2010, section 1202.4 required the court to impose a felony restitution fine between $200 and $10,000 and directed that it consider "any relevant factors," including the defendant's ability to pay, in setting the amount. (§ 1202.4, former subd. (d).)

Defendant failed to raise an issue concerning his ability to pay at either sentencing proceeding. The claim is therefore forfeited on appeal. (*People v. Miracle* (2018) 6 Cal.5th 318, 356; *People v. Williams* (2015) 61 Cal.4th 1244, 1291; *People v. Avila* (2009) 46 Cal.4th 680, 729.) In any event, we may assume the trial court was aware of and fulfilled its statutory duty to consider ability to pay when setting the restitution fine. (Evid. Code, § 664; see *Williams*, at p. 1291.) Defendant identifies nothing in the record indicating the court breached its duty to consider ability to pay and has thus failed to establish an abuse of discretion. (See *Miracle*, at p. 356; *People v. Gamache* (2010) 48 Cal.4th 347, 409.) Indeed, because the $4,000 fine was less than half the $10,000 recommended by the probation

department, it appears the court exercised its discretion in this regard, in light of the circumstances before it.

F.  *Relief under Senate Bill No. 1437*

Defendant filed a supplemental brief shortly before oral argument asking this court to vacate his murder conviction because it may have been based on a felony-murder theory that was rejected by the Legislature in Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437).  We delayed submission of the case and received full briefing of the issue.  We now conclude defendant is not entitled to relief because any error brought about by retroactive application of Senate Bill 1437 is harmless beyond a reasonable doubt.

"Under the felony-murder doctrine as it existed at the time of [defendant's] trial, 'when the defendant or an accomplice kill[ed] someone during the commission, or attempted commission, of an inherently dangerous felony,' the defendant could be found guilty of the crime of murder, without any showing of 'an intent to kill, or even implied malice, but merely an intent to commit the underlying felony.' (*People v. Gonzalez* (2012) 54 Cal.4th 643, 654 [142 Cal. Rptr. 3d 893, 278 P.3d 1242].)  Murders occurring during certain violent or serious felonies were of the first degree, while all others were of the second degree.  (Pen. Code, § 189, subds. (a), (b); *Gonzalez*, at p. 654.)" (*People v. Strong* (2022) 13 Cal.5th 698, 704 (*Strong*).) The law changed effective January 1, 2019, however, when the Legislature enacted Senate Bill 1437.  With the goal of "more equitably sentenc[ing] offenders in accordance with their involvement in homicides" (Stats. 2018, ch. 1015, § l, subd. (b)), Senate Bill 1437 significantly changed the scope of murder liability for defendants who did not actually kill or intend to kill

anyone, including those prosecuted on a felony-murder theory (see Stats. 2018, ch. 1015, § 1, subd. (c)).[8] As relevant here, the amended murder statute now limits felony-murder liability to: (1) "actual killer[s]" (§ 189, subd. (e)(1)); (2) those who, "with the intent to kill," aided or abetted "the actual killer in the commission of murder in the first degree" (*id.*, subd. (e)(2)); and (3) "major participant[s] in the underlying felony" who "acted with reckless indifference to human life" (*id.*, subd. (e)(3)).

Senate Bill 1437 also created a procedural mechanism for those convicted of murder under prior law to seek retroactive relief. (See § 1172.6; see also *Strong*, *supra*, 13 Cal.5th at pp. 708–709; *People v. Lewis* (2021) 11 Cal.5th 952, 959–960.) Under section 1172.6,[9] the process begins with the filing of a petition declaring that "[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189" made by Senate Bill 1437. (§ 1172.6, subd. (a)(3).) The trial court then reviews the petition to determine whether a prima facie showing has been made that the petitioner is entitled to relief. (*Id.*, subd. (c).) "If the petition and record in the case establish conclusively that the defendant is ineligible for relief, the trial court may dismiss the petition. (See § 1172.6, subd. (c); *Lewis*, at pp. 970–972.)" (*Strong*, at p. 708.) Otherwise, the court must issue an order to show cause

---

[8] The bill also altered murder liability under the natural and probable consequences doctrine. (See *People v. Gentile* (2020) 10 Cal.5th 830, 839 (*Gentile*).) Those changes are not at issue here.

[9] The relevant statute was originally codified in section 1170.95 but was later renumbered without substantive change. (Stats. 2022, ch. 58, § 10; see *Strong*, *supra*, 13 Cal.5th at p. 708, fn. 2.)

(§ 1172.6, subd. (c)) and hold an evidentiary hearing at which the prosecution bears the burden "to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder" under the law as amended by Senate Bill 1437 (*id.*, subd. (d)(3)). In addition to evidence admitted in the petitioner's prior trial, both "[t]he prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens." (*Ibid.*) "If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (*Ibid.*)

Because Senate Bill 1437 created this "specific mechanism for retroactive application of its ameliorative provisions" (*Gentile*, *supra*, 10 Cal.5th at p. 853), we reasoned in *Gentile* that the section 1172.6 petition procedure was the sole avenue through which those convicted under prior law could obtain relief. We held that changes to the murder statutes enacted by Senate Bill 1437 did not apply to nonfinal convictions on direct appeal. (*Gentile*, at p. 859.) The Legislature abrogated this holding the following year, however, by expressly authorizing challenges on appeal. A newly added subdivision states: "A person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill 1437." (§ 1172.6, subd. (g); see Stats. 2021, ch. 551, § 1.)

Defendant was convicted of first degree murder in February 2000. Consistent with the law at that time, the jury instructions defined murder as the unlawful killing of a human being committed either with malice aforethought or during the

40

commission or attempted commission of a felony, in this case kidnapping.  Based on this instruction, defendant contends his jury may have relied on a now-invalid theory of felony murder in voting to convict him.  He argues his murder conviction must be reversed and the case remanded for a new trial of both guilt and, if applicable, penalty phases.

Defendant contends the recent amendments to section 1172.6 give him a right to obtain relief on direct appeal rather than through the statute's petition process.  (See § 1172.6, subd. (g).)  Assuming his reading of the statute is correct, the issue is complicated here by the case's procedural posture.  Section 1172.6, subdivision (g) permits a defendant "whose conviction is *not final*" to "challenge on direct appeal the validity of *that conviction*" based on changes to the murder statutes. (Italics added.)  Nearly 15 years ago, we unanimously affirmed the judgment that defendant was guilty of Uwe's murder.  (See *Wilson*, *supra*, 44 Cal.4th at pp. 769, 841–842.) "Under our precedent and the high court's, a judgment becomes final ' "where the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari ha[s] elapsed." ' " (*People v. Padilla* (2022) 13 Cal.5th 152, 162; see *People v. Buycks* (2018) 5 Cal.5th 857, 876, fn. 5.) Accordingly, defendant's murder conviction would appear to have become final no later than 2009, when the time expired for seeking certiorari in the United States Supreme Court.  (See *People v. Vaughn* (1973) 9 Cal.3d 321, 326, fn. 3.)

We addressed the finality of a murder conviction under somewhat similar circumstances in *People v. Jackson* (1967) 67 Cal.2d 96.  After this court affirmed Jackson's death judgment on appeal, he obtained a reversal of the penalty judgment in a habeas corpus proceeding.  The penalty phase was retried and

Jackson again received the death penalty. (*Id.* at pp. 97–98.)
On appeal from that second judgment, Jackson, like defendant
here, sought the benefit of an ameliorative change in the law.[10]
We concluded the new rule, concerning admissibility of a
defendant's extrajudicial statements, could not be applied
retroactively to Jackson's guilt judgment because that judgment
had long before become final. (*Jackson*, at p. 98.) We explained
that when a penalty phase judgment alone is reversed, "the
original judgment on the issue of guilt remains final during the
retrial of the penalty issue and during all appellate proceedings
reviewing the trial court's decision on that issue." (*Id.* at p. 99;
accord *People v. Kemp* (1974) 10 Cal.3d 611, 614.)

Only a defendant whose conviction for murder, attempted
murder, or manslaughter "*is not final* may challenge on direct
appeal the validity of that conviction based on" changes to the
murder statutes enacted by Senate Bill 1437. (§ 1172.6,
subd. (g), italics added.) Although *Jackson* concerned a death
verdict reversed on habeas rather than on direct appeal, its
reasoning would suggest that our 2008 affirmance of the guilt
judgment rendered defendant's murder conviction final.
Defendant challenges this conclusion, however. He argues the
propriety of his death sentence, now under review, depends
upon the validity of his first degree murder conviction. The
Attorney General does not dispute defendant's view and
assumes for purposes of this appeal that defendant may
challenge his conviction under section 1172.6, subdivision (g) in
this appeal from his sentence. In light of the Attorney General's
position, we too will assume that the claim is properly presented

---

[10] *Jackson* was decided about a year and a half after *In re
Estrada* (1965) 63 Cal.2d 740.

under section 1172.6, subdivision (g). Nevertheless, we conclude defendant is not entitled to reversal because any retroactive error is harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)

When a court instructs on two theories of an offense, only one of which is legally valid, the problem is known as "alternative-theory error." (*People v. Aledamat* (2018) 8 Cal.5th 1, 9 (*Aledamat*); see *In re Lopez* (2023) 14 Cal.5th 562, 567 (*Lopez*).) Defendant's jury was instructed it could find him guilty of first degree murder based on either a premeditation and deliberation or a felony-murder analysis. Of course, the jury could have concluded, consistent with premeditation and deliberation requirements, that defendant himself shot Uwe intending to kill him. However, it is at least possible they were not sure whether defendant or Phillips fired the fatal shots. In that case, the felony-murder theory would have come into play. The Attorney General concedes that, after Senate Bill 1437's changes to section 189, felony murder can no longer be relied upon in this case, because it is possible that the jury based its verdict on felony murder as it was previously defined, rather than on premeditation and deliberation. If it had done so, it could conceivably have concluded that defendant intended to kidnap Uwe but not that he intended to kill him. Thus, the parties agree that Senate Bill 1437 created the possibility of alternative-theory error in this case retroactively. (See *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 592 (*Glukhoy*).)

The Courts of Appeal have handled claims under section 1172.6, subdivision (g) by finding retroactive error and reviewing for harmlessness. (See, e.g., *Glukhoy, supra,* 77 Cal.App.5th at pp. 592–599; *People v. Hola* (2022) 77 Cal.App.5th 362, 376–377 & fn. 14.) Unlike trial court

proceedings on section 1172.6 resentencing petitions, parties on appeal are generally prevented from presenting new evidence to support their positions. While a defendant can elect to forgo the presentation of new evidence by pursuing a section 1172.6, subdivision (g) claim on appeal, the prosecution has no such choice. The filing of such a claim on appeal deprives the People of the statutorily conferred ability to submit additional evidence of the defendant's liability on a still-valid theory. (See § 1172.6, subd. (d); see also *Gentile, supra,* 10 Cal.5th at pp. 855–856.) Any unfairness to the prosecution, however, is mitigated by the different remedies available in the two proceedings. When an error asserted on appeal in a subdivision (g) claim is not harmless, the defendant is entitled only to *retrial* of the murder charge, not resentencing. (See *Hola,* at pp. 376–377.)

In view of the uncertainties in how section 1172.6, subdivision (g) should operate, the Attorney General suggests that we either issue a limited remand for the trial court to consider defendant's claim or reject the claim without prejudice to defendant renewing it in a resentencing petition filed in the trial court. Defendant, however, protests that newly added subdivision (g) gives him a right to have the claim resolved on appeal. He contends he is entitled to reversal of the guilt and penalty judgments based on Senate Bill 1437's changes to the law and that the error cannot be deemed harmless. Considering defendant's arguments, we assume without deciding that his claim of retroactive error may be raised on appeal and is subject

to a harmless error analysis.[11]  We conclude the error here was harmless.[12]

*Aledamat* discussed the standard of prejudice applicable to alternative-theory error.  (*Aledamat*, *supra*, 8 Cal.5th at p. 9.)  It held that "no higher standard of review applies to alternative-theory error than applies to other misdescriptions of the elements [of an offense].  The same beyond a reasonable doubt standard applies to all . . . ."  (*Ibid*.)  Under this standard, a conviction must be reversed unless a reviewing court, "after examining the entire cause, including the evidence, and considering all relevant circumstances, . . . determines the error was harmless beyond a reasonable doubt."  (*Id*. at p. 13; see *Chapman*, *supra*, 386 U.S. at p. 24.)

We recently elaborated on the reasonable doubt test, as applied to alternative-theory error, in *Lopez*.  We explained that "a reviewing court may hold the error harmless where it would be impossible, based on the evidence, for a jury to make the findings reflected in its verdict without also making the findings that would support a valid theory of liability.  (*Aledamat*, *supra*,

---

[11]    Defendant repeatedly refers to the *Chapman* harmless error standard in his briefing.  In his supplemental reply brief, defendant also argues that, absent the now-invalid felony murder instruction, he would have offered additional evidence and cross-examined differently.  Insofar as he seeks to make an argument that the error is reversible per se, we decline to reach it.  We need not, and typically do not, address arguments raised for the first time in a reply brief.  This consideration is particularly weighty here, given that defendant did not file his supplemental reply brief until well after oral argument.

[12]    We would note, however, that a harmless error analysis on direct appeal is distinct from the superior court's inquiry under section 1172.6, if a petition is filed there.

8 Cal.5th at p. 15.)" (*Lopez*, *supra*, 14 Cal.5th at p. 568.) Furthermore, "while 'overwhelming' evidence may demonstrate harmlessness, a court's analysis of whether the evidence is 'overwhelming' in this context is not as subjective or free-ranging as that term might imply." (*Ibid.*) Instead, the reviewing court has an obligation "to rigorously review the evidence to determine whether any rational juror who found the defendant guilty based on an invalid theory, and made the factual findings reflected in the jury's verdict, would necessarily have found the defendant guilty based on a valid theory as well." (*Ibid.*) Applying this standard, we conclude no reasonable jury that made the findings reflected in the verdicts from defendant's initial trial could have failed to find the facts necessary to support liability under a valid theory of murder. (See *id.* at p. 583; *Aledamat*, *supra*, 8 Cal.5th at p. 8.)

As amended by Senate Bill 1437, a defendant is guilty of first degree felony murder if he is the "actual killer" (§ 189, subd. (e)(1)); if, "with the intent to kill," he aids or abets "the actual killer in the commission of murder in the first degree" (*id.*, subd. (e)(2)); or, if he was a "major participant in the underlying felony" and "acted with reckless indifference to human life" (*id.*, subd. (e)(3)). For purposes of our review here, we focus on the third prong only. In addition to finding him guilty of first degree murder, defendant's jury sustained special circumstance allegations for murder in the commission of a kidnapping and torture-murder. It further found that defendant personally used a firearm in committing the murder. The question is whether it would have been impossible for a jury to make these findings without also finding that defendant was a major participant in the underlying felony of kidnapping and acted with reckless indifference to human life.

Here, the jury found that Uwe's murder was committed while defendant "was engaged in the commission of the crime of kidnapping." The jury was instructed that the kidnapping must not be "merely incidental to the commission of the murder." The jury also found that, in committing the murder, defendant personally used a handgun. Defendant argues this finding on the firearm enhancement does not compel a conclusion that the jury found him to be the actual killer because the "elements of felony murder included the kidnapping, for which there was clear evidence that [he] used a firearm." Regardless of whether the jury found defendant to be "the actual killer" under section 189, subdivision (e)(1), trial evidence supporting these findings demonstrated that defendant forced Uwe into a car at gunpoint and drove him to his house. (*Wilson*, *supra*, 44 Cal.4th at p. 770.) Defendant left him there tied up while he recruited three associates, saying he planned to kill Uwe. (*Id.* at p. 771.) He later wrapped Uwe in plastic sheeting and placed him in his car along with a case of chemical drain cleaner, "which defendant said he planned to pour on Uwe's body in order to dissolve it." (*Id.* at p. 773.) Then he and Phillips drove off with Uwe. (*Ibid.*) In light of the jury's verdicts and this evidence supporting them, it would have been impossible for the jury to have found that defendant engaged in kidnapping and used a firearm without also finding that defendant was a major participant in the kidnapping.

The verdicts are also relevant to the second prong of section 189, subdivision (e)(3), which requires that the person "acted with reckless indifference to human life." Defendant's jury sustained an allegation that Uwe's murder "was intentional

and did involve the infliction of torture."[13] The jury was instructed that it could not sustain the torture special circumstance unless, in addition to finding the murder intentional, it found that defendant both "intended to" and "did in fact inflict extreme cruel physical pain and suffering upon a living human being." (CALJIC No. 8.81.18.)[14] The jury's finding

---

[13] The Attorney General concedes that this finding does not render defendant categorically ineligible for relief. The torture special circumstance required a finding that "[t]he murder was intentional" (§ 190.2, subd. (a)(18)), but defendant's jury was not instructed that it had to find defendant *personally* harbored an intent to kill. Because defendant and Phillips were tried together, although to separate juries (see *Wilson*, *supra*, 44 Cal.4th at p. 770, fn. 1), it would have been possible for the jury to find the torture special circumstance true without agreeing that defendant, as opposed to Phillips, intended to kill Uwe.

[14] There was a minor discrepancy in the written version of CALJIC No. 8.81.18 and the version read to the jury. The trial court properly told the jury, in its oral instruction, that the special circumstance required a finding that "*[t]he defendant* intended to inflict extreme cruel physical pain and suffering. . . ." (Italics added.) In the written instruction, however, the word "the" was crossed out, and the required finding was described as: "*[A] defendant* intended to inflict extreme cruel physical pain and suffering. . . ." (Italics added.) We concluded this error in the written instruction was harmless beyond a reasonable doubt for four reasons. (*Wilson*, *supra*, 44 Cal.4th at p. 804.) "First, the court orally instructed the jury with the correct instruction. . . . Second, there is no indication the jury was aware of the slight difference between the written and oral versions of the instructions, as it asked no questions about this point. Third, the evidence was overwhelming that defendant beat, tortured and killed Uwe Durbin. . . . Finally, considering the other elements of the torture instruction, which the jury necessarily found true — that the murder was intentional and defendant did in fact inflict cruel physical pain and suffering — it would have been impossible on these facts for

was supported by uncontroverted evidence establishing that, after kidnapping Uwe at gunpoint, defendant shot him in the kneecap, brutally beat and tortured him for hours, then drove him to a remote location where he was killed. Any rational juror who found that defendant personally used a firearm in committing a kidnapping or homicide, and inflicted "extreme cruel physical pain and suffering" (CALJIC No. 8.81.18) upon the murder victim, would necessarily have found that defendant acted with reckless indifference to human life.

We conclude it would have been impossible for the jury to make the findings reflected in its verdicts without concluding, at the very least, that defendant was a major participant in the felony kidnapping who acted with reckless indifference to human life. (See *Aledamat*, *supra*, 8 Cal.5th at p. 15.) As a result, we need not address the application of "actual killer" or aiding and abetting theories of liability. Assuming defendant's section 1172.6, subdivision (g) claim is properly before us in this appeal from a penalty retrial, any retroactive error from Senate Bill 1437's ameliorative changes is harmless beyond a reasonable doubt.

---

the jury to have found defendant did not *intend* to torture the victim." (*Ibid.*)

## III.  DISPOSITION

The judgment is affirmed.


**CORRIGAN, J.**


**We Concur:**

**GUERRERO, C. J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Wilson

---

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal**
**Original Proceeding**  XX
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S189373
**Date Filed:**  June 8, 2023

---

**Court:**  Superior
**County:**  Riverside
**Judge:**  Elisabeth Sichel

---

**Counsel:**

Patrick Morgan Ford, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Xavier Becerra and Rob Bonta, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Julie L. Garland and James William Bilderback II, Assistant Attorneys General, Holly Wilkens, Ronald A. Jakob, Alana Cohen Butler and Meredith S. White, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Patrick Morgan Ford
Attorney at Law
1901 First Avenue, Suite 400
San Diego, CA 92101
(619) 236-0679

Meredith S. White
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9069